FILED
2010 Jul-20  PM 02:41
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| GALAPAGOS, LLC;<br>BEOWULF LLC; ROBERT L.<br>WIGGINS, JR.; and ANN K.<br>WIGGINS, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action Number<br>**2:09-cv-0978-AKK** |
| **vs.** | ) ) ) | |
| VISION BANK; BAMA BAYOU,<br>LLC; JOE RALEY BUILDERS,<br>INC.; SCOTT RALEY; THE<br>MITCHELL COMPANY, INC.;<br>DR. KELLY SCHUCK; LINDA<br>J. PEACOCK; BAKER<br>DONELSON BEARMAN<br>CALDWELL AND<br>BERKOWITZ P.C.; GULF<br>WORLD, LLC; WAYNE<br>BURNETT; ANDREW<br>BRASWELL; DARRELL<br>MELTON; AND RALEY<br>BUILDERS LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Presently before the court are four motions to dismiss Plaintiffs' Amended

Complaint, which are filed by Defendants Linda J. Peacock ("Peacock"), Baker

Donelson Bearman Caldwell & Berkowitz P.C. ("Baker Donelson"), Bama Bayou,

LLC ("Bama Bayou"), The Mitchell Company, Inc. ("The Mitchell Company"),

Joe Raley Builders, Inc., Raley Builders LLC, Scott Raley ("Raley"), Gulf World,

LLC ("Gulf World"), Wayne Burnett ("Burnett"), and Dr. Kelly Schuck

("Schuck").  Doc. 97, Doc. 101, Doc. 104, and Doc. 108.[1]  Defendants Andrew

Braswell ("Braswell"), Darrell Melton ("Melton"), and Vision Bank filed a motion

for summary judgment, which raises several arguments similar to those raised in

the motions to dismiss.[2]  Doc. 102.  To the extent appropriate, the court will

consider all five motions together.[3]

---

[1]Reference to a document number, ("Doc. ___"), refers to the number assigned to each document as it is filed in the court's record.

[2]Additionally, The Mitchell Company and Bama Bayou filed an Unopposed Motion to Exceed Page Limitation for Reply Brief by Five (5) Pages, (doc. 123), and Schuck filed a Motion to Amend/Correct her reply brief, (doc. 126).  These motions are GRANTED.

[3]This case, previously assigned to Judge L. Scott Coogler, was reassigned to the undersigned on March 31, 2010.  Doc. 141.  All Defendants filed motions to dismiss or for summary judgment after Plaintiffs filed their Complaint.  Doc. 31; Doc. 34; Doc. 37; Docs. 82-86.  Plaintiffs moved for leave to file an amended complaint, which the court granted.  Doc. 90; Doc. 94; Doc. 95.  By text order, Judge Coogler mooted the pending motions to dismiss and for summary judgment on December 1, 2009.  Defendants then filed the motions that are now pending before this court.  Several Defendants adopted and incorporated by reference their previous motions to dismiss or for summary judgment.  Additionally, several Defendants also adopted and incorporated by reference the motions filed by other Defendants.  Although adoption and incorporation by reference can be an efficient tool, in cases such as this one in which the parties had different relationships to Plaintiffs and the transaction at issue, such adoptions are imprecise and leave the court to sort through, or simply guess, which arguments actually apply to each party.  Moreover, it is particularly inappropriate on a motion to dismiss to adopt and incorporate by reference briefs and evidence from a summary judgment motion because of the different standards of review that the court must apply.  To assist the court to resolve promptly the issues the parties may raise in subsequent motions, going forward, the parties *shall not* adopt or incorporate by reference either their own previous briefs and evidence or the briefs and evidence of other parties.  Parties are, however, free to file joint briefs.

# I.   FACTUAL BACKGROUND

This case arises out of a failed property development in Orange Beach,

Alabama.  Had the development proceeded as intended, the property would have

housed a marine mammal display facility, a hotel condominium complex, and

other facilities.  The development, however, allegedly fell victim to the economic

downturn, mismanagement, fraud, or some other force and, ultimately, failed.  As

with many such projects, the development's demise has spawned a considerable

amount of litigation – this action is just one of three cases that are proceeding in

federal and state court related to this project.  In this action, Plaintiffs allege in

their single-count Amended Complaint that Defendants committed securities fraud

in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934

(the "Exchange Act"), 15 U.S.C. § 78a *et seq.*, and Rule 10b-5, 17 C.F.R.

§ 240.10b-5.

To provide a framework for the legal issues raised in Defendants' motions,

the court begins with a brief background of the parties and the transaction at issue.

As stated in the Amended Complaint:

> Gulf World Marine Park is a federally licensed Marine Mammal
> Display Facility.  Defendant Gulf World LLC owned the license for
> Gulf World Marine Park and in 2003 began plans for developing a
> hotel condominium as part of the Marine Park at both its Panama
> City, Florida and Orange Beach, Alabama locations.  The hotel
> component of the Orange Beach location of Gulf World Marine Park

> was to be known as Gulf World's Paradise Resort . . . and was to be
> part of a larger development surrounding such Park known as
> Riverwalk, later renamed Bama Bayou ("Riverwalk/Bama Bayou").

Doc. 95 ¶ 19.

According to Plaintiffs, Bama Bayou, The Mitchell Company, Joe Raley

Builders, Inc., Raley, and Raley Builders LLC were the developers for the entire

Riverwalk/Bama Bayou development.  *Id*. ¶ 20.  Plaintiffs contend that The

Mitchell Company, through a subsidiary, entered a joint venture with Gulf World

to form Bama Bayou.  *Id*. ¶ 21.  Raley was the chief executive of Joe Raley

Builders, Inc., manager of Gulf World, Raley Builders LLC, and Bama Bayou.  *Id*.

¶ 34.  Burnett was an investment adviser, promoter, developer, and accountant for

several of Raley's ventures, including the Bama Bayou project.  *Id*.  Vision Bank

is a Florida bank that allegedly helped finance and promote the development.  *Id*.

¶¶ 21, 34, 41.  Braswell and Melton worked with or for Vision Bank.  *Id*. ¶¶ 15,

34.

Plaintiffs Robert L. Wiggins, Jr. ("Robert Wiggins") and Ann K. Wiggins

("Ann Wiggins") are adult residents of Birmingham, Alabama.  *Id*. ¶ 5.  Plaintiff

Galapagos, LLC ("Galapagos") is a limited liability company formed under

Alabama law.  *Id*. ¶ 3.  Plaintiff Beowulf LLC ("Beowulf") is also a limited

liability company formed under Alabama law.  *Id*. ¶ 4.  Robert and Ann Wiggins

are members of Galapagos, each owning 40% of the company.  *Id*. ¶¶ 42, 55, 174.
Galapagos and two other investors not parties in this action – the late McRhee
Hugghins ("Hugghins") and Robert Younce ("Younce") – invested in the hotel
condominium project at the Orange Beach location.  *Id*. ¶¶ 42, 207, 211.[4]

Peacock, an attorney with the Baker Donelson law firm, allegedly
approached Plaintiffs in 2005 and 2006 about investing in the Panama City[5] and
Orange Beach developments and, specifically, the hotel components for those
developments.  *Id*. ¶¶ 8, 9, 25, 27.  Schuck, who is allegedly in personal and
business relationships with Peacock, was also allegedly involved in promoting the
Orange Beach development.  *Id*. ¶¶ 25, 27, 57.  She also owned 20% of Galapagos
despite contributing no money or other assets to Galapagos.  *Id*. ¶¶ 55, 174.

According to Plaintiffs, based on the promoter's representations, in June
2006, the Wiggins contributed $200,000 each to Galapagos, which in turn bought
a one-third share in an investment package that included a small piece of property
for the hotel, which the developers would construct for $5 million in conjunction
with the larger marine park with guaranteed financing provided by Vision Bank.
*Id*. ¶¶ 171, 209.   In September 2006, Galapagos was scheduled to close a

---

[4]Hugghins invested through Hugghins-Orange Beach LLC and Younce invested through
Younce-Orange Beach LLC.  *Id*. ¶ 211.

[5]The Panama City investment is not at issue in this lawsuit.

mortgage and loan with Vision Bank to fund the construction advances for the hotel. *Id.* ¶ 55. The Wiggins, however, refused to authorize Galapagos to close the loan or mortgage because the developers had not provided a construction contract, performance and payment bond, or architect's contract or certification assuring that they would complete the project for $5 million. *Id.* Nevertheless, unbeknownst to the Wiggins, Schuck falsely represented that she had the authority to close the loan for Galapagos, and she signed for Galapagos on September 29, 2006. *Id.* ¶¶ 55, 56. With the knowledge of Vision Bank and other Defendants, Raley began taking construction draws on the $5 million line-of-credit without the Wiggins' knowledge or approval. Doc. 95 ¶¶ 54, 58. Defendants exhausted the $5 million before completing even half of the hotel development or completing the marine park. *Id.* ¶¶ 54, 212.

## II.   STANDARD OF REVIEW

### A.   *Motion to Dismiss*

Federal Rule of Civil Procedure 12(b)(6) permits dismissal when a complaint fails to state a claim upon which relief may be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937, 1949 (2009) (citations and internal quotation marks

omitted).  A complaint states a facially plausible claim for relief "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citation omitted).  The complaint must establish "more than a sheer possibility that a defendant has acted unlawfully." *Id*; s*ee also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level . . . ." (citation omitted)).  Ultimately, this inquiry is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1950.

On a motion to dismiss under Rule 12(b)(6), the court accepts all factual allegations as true.  *See, e.g., Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000)*.*  However, legal conclusions unsupported by factual allegations are not entitled to that assumption of truth.  *Iqbal*, 129 S. Ct. at 1950.

**B.    *Motion for Summary Judgment***

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a

party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).

## III.   ANALYSIS

The court addresses Defendants' arguments in the following order: (1) whether Beowulf and the Wiggins lack standing to pursue this lawsuit because they did not purchase or sell a security; (2) whether Galapagos lacks standing because Schuck (who Defendants claim is Galapagos's manager and who is a Defendant in this matter) did not bring the action; (3) whether Plaintiffs properly allege the existence of a security; (4) whether the Amended Complaint meets the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act for a securities fraud claim; (5) whether the Amended Complaint alleges control person liability; (6) whether Defendants Vision Bank, Melton, and Braswell may be liable as secondary actors; (7) whether Gulf World and Raley Builders LLC are due to be dismissed as parties without liability; (8) whether the Alabama Legal Services Liability Act bars Plaintiffs' claims against Peacock and Baker Donelson; and (9) Peacock and Baker Donelson's motion to strike, which piggybacks on their heightened pleading requirements arguments.

**A.   *This Court Has No Jurisdiction Over the Claims by Beowulf and the Wiggins Because Those Parties Do Not Have Standing under Rule 10b-5.***

The first question the court must address is whether it has subject matter

jurisdiction to entertain Plaintiffs' claim under 28 U.S.C. § 1331[6] and 15 U.S.C. § 78aa.[7] *Ledford v. Peeples*, 605 F.3d 871, 900-01 (11th Cir. 2010) (finding that the district court should examine a plaintiff's standing to bring a federal securities claim at the motion to dismiss stage).

Plaintiffs allege a violation of Section 10(b) of the Exchange Act and Rule 10b-5, which is promulgated under Section 10(b).  Although "Section 10(b) . . . does not by its terms provide an express civil remedy for its violation," the Supreme Court has found an implied private right of action under Rule 10b-5. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 729-31 (1975).  However, standing under Rule 10b-5 is "limited to actual purchasers and sellers of securities."  *Id*. at 730-31 (agreeing with *Birbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952)).  In *Blue Chip Stamps*, the Supreme Court determined that the petitioners, who declined to purchase the security at issue, were not purchasers or sellers and thus lacked standing under Rule 10b-5.  *Id*. at 754-55 (noting further that "[w]e do not believe that [] a shifting and highly fact-oriented

---

[6]Section 1331 states: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

[7]Section 78aa states, in relevant part: "The district courts . . . shall have exclusive jurisdiction of violations of the [the Securities and Exchange Act of 1934] or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder."

disposition of the issue of who may bring a damages claim for violation of Rule 10b-5 is a satisfactory basis for a rule of liability imposed on the conduct of business transactions").

The Eleventh Circuit recently addressed this rule in *Ledford*.[8]  605 F.3d at 900-03.  In that case, the security at issue was a 50% interest in Signature Hospitality Carpets, LLC ("Signature"), which was owned jointly by Dynavision Group, LLC ("Dynavision") and three individuals.  *Id*. at 878.  Dynavision was principally owned by three additional individuals – Jimmy Ledford, Larry O'Dell, and Bryan Walker.  *Id*. at 877-78.  Dynavision and its three owners brought suit against the purchasers of Signature.  The Eleventh Circuit concluded that Ledford, O'Dell, and Walker did not have standing:

> According to the allegations of the complaint and the relevant deposition testimony, there was but one seller, Dynavision.  It sold one security, its fifty-percent interest in Signature.  Dynavision, as the seller of a security, therefore had standing to sue Peeples under Rule 10b-5(b).  Co-plaintiffs did not.

*Id*. at 901.  The Eleventh Circuit further rejected the plaintiffs' argument that they had standing because Dynavision's loss was passed on to Ledford, O'Dell, and Walker through their ownership interests:

---

[8]The Eleventh Circuit amended its original *Ledford* opinion, 568 F.3d 1258 (11th Cir. 2009), after the parties briefed this issue.  However, the Eleventh Circuit's holding on the standing issue did not change and, therefore, further briefing from the parties is unnecessary.

> In other words, they were like the shareholders of a corporation that
> sold securities it owned in reliance on a third party misrepresentation
> made in violation [of] Rule 10b-5(b) and who, as a result, incurred a
> loss.  Under *Blue Chip Stamps*, however, such derivative injury to
> shareholders is not directly compensable under Rule 10b-5.  421 U.S.
> at 737-38, 95 S. Ct. at 1926.

*Id*. at 901 n.83.  *See also Fin. Sec. Assurance v. Stephens, Inc.*, 500 F.3d 1276,

1282-88 (11th Cir. 2007) (holding that insurer of defaulted municipal bonds did

not have standing under *Blue Chip Stamps* because it was not a purchaser or seller

of a security; rejecting the insurer's arguments that it had standing because it was

the true "party at risk" or the guarantor).

After determining in *Ledford* that the three individual owners of the

company lacked standing, the Eleventh Circuit concluded that the district court

should have dismissed their federal securities fraud claims under Federal Rule of

Procedure 12(b)(1) because their alleged claims were "wholly insubstantial and

frivolous."  *Ledford*, 605 F.3d at 901-02 (quoting *Steel Co. v. Citizens for a Better

Env't*, 523 U.S. 83, 89 (1998)).

Here, the Amended Complaint alleges: "Ann and Robert Wiggins made

initial payments of $200,000 each to purchase shares in a separate company . . .

known as Galapagos LLC and ***Galapagos LLC in turn made a down payment of***

***$400,000 towards the investment contract*** the defendants offered to it and the

Wiggins subject to their right to rescind and/or resale such investment contract to

12

the Riverwalk/Bama Bayou in the event that such investment was not closed on the basis represented." Doc. 95 ¶ 42 (emphasis added). Plaintiffs admit in their response brief that Galapagos, not the Wiggins or Beowulf,[9] purchased the one-third interest in the hotel component of the marine park. Doc. 113 at 38. However, Plaintiffs argue that the Wiggins' investment in Galapagos entitles them to standing because "[t]he defendant-promoters cast the investment in the hotel offered to the Wiggins in the form of two 40% interests in Galapagos and cast the investment by Galapagos in the form of a one-third share in the investment contract for the underlying hotel." *Id*.

The court finds no meaningful distinction between the individual owners dismissed in *Ledford* and the Wiggins here. In *Ledford*, the dismissed plaintiffs held ownership interests in the LLC that sold the security at issue. 605 F.3d at 901. Despite the dismissed plaintiffs' protestations that they, as owners of the LLC, would suffer Dynavision's losses, the Eleventh Circuit concluded that their potential injury did not entitle them to standing since Dynavision sold the security. *Id*. Similarly here, even though the promoters allegedly approached the Wiggins

---

[9]Plaintiffs make little effort to rehabilitate Beowulf's claim and the Amended Complaint provides little explanation of Beowulf's role in the transaction. In fact, Beowulf is mentioned only twice in the Amended Complaint and it appears that, at most, Beowulf was offered the opportunity to invest in the alleged investment contract, which is undoubtedly insufficient to establish standing. Doc. 95 ¶¶ 4, 173; *Blue Chip Stamps*, 421 U.S. at 730-31.

about the investment, the Amended Complaint makes clear that the Wiggins chose

to use an LLC – Galapagos – as the vehicle to purchase the alleged investment

contract for the hotel development.  In fact, the Amended Complaint explicitly

states that the Wiggins had the opportunity to directly purchase the investment

contract, but opted to form an LLC instead:

> Defendants first presented the proposed investment contract to
> investors in the form of an Option Agreement . . . [that], if exercised,
> would give investors the right to purchase shares in a single asset
> company that would own the Paradise Resort component . . . .  That
> *Option Agreement* . . . , however, was never exercised by the plaintiff
> or any other investors.  Instead, Ann and Robert Wiggins made initial
> payments of $200,000 each to purchase shares in a separate company
> unrelated to such Option Agreement known as Galapagos LLC and
> Galapagos LLC in turn made a down payment of $400,000 towards
> the investment contract . . . .

Doc. 95 ¶ 42; *see also id*. ¶ 209 ("On June 8, 2006, Ann and Robert Wiggins

purchased separate interests in Galapagos LLC, which was the company having

the right to participate in the profits of the Marine Park hotel condominium.

Galapagos then purchased an undivided one-third interest in the building site and

other components of the investment package.").  Thus, to the extent that a party

purchased an investment contract in the hotel development, the purchaser is

Galapagos, not the Wiggins.  To conclude otherwise would require precisely the

type of "shifting and highly fact-oriented" inquiry that the Supreme Court

cautioned courts to avoid.  *Blue Chip Stamps*, 421 U.S. at 755.

14

Plaintiffs additionally argue that the Wiggins' purchase of the two 40%

interests in Galapagos constitutes a security, and thus permits them standing,

because the statutory definition of security includes a "'preorganization certificate

or subscription, transferable share  . . .  or any certificate of interest or

participation in . . . or warrant or right to subscribe to a purchase, any of the

foregoing,' and as 'stock' or an 'option' to purchase shares in a company."  Doc.

114 at 25-27 (citing 15 U.S.C. § 78c(a)(10)); Doc. 113 at 33-35.  This argument is

also unpersuasive.

The Eleventh Circuit noted in *Ledford* that "[t]he literal definition of a

security under the 1934 Securities and Exchange Act, as codified in 15 U.S.C. §

78c(a)(10), does not include an interest in a limited liability company."  605 F.3d

at 903 n.94 (citation omitted) (but concluding that it did not need to determine

whether Dynavision's interest in Signature was a security because the defendant

did not raise the question).  However, courts have concluded that interests in an

LLC may be investment contracts and therefore securities.  *See, e.g., Great Lakes*

*Chem. Corp. v. Monsanto Co.*, 96 F. Supp. 2d 376, 389-93 (D. Del. 2000)

(considering whether purchase of LLC interests met investment contract test);

*Keith v. Black Diamond Advisors, Inc.*, 48 F. Supp. 2d 326, 332 (S.D.N.Y. 1999)

(noting that "LLC membership interests are not 'securities' unless they meet the

four criteria of an 'investment contract'").  Unlike "investment contracts," which is a term intended "to encompass the range of novel and unusual instruments whose economic realities invite application of the securities laws," "the term 'stock' refers to a narrower set of instruments with a common name and characteristics." *Robinson v. Glynn*, 349 F.3d 166, 173 (4th Cir. 2003) (citing *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 (1985)).  "The characteristics typically associated with common stock are (i) the right to receive dividends contingent upon an apportionment of profits; (ii) negotiability; (iii) the ability to be pledged or hypothecated; (iv) the conferring of voting rights in proportion to the number of shares owned; and (v) the capacity to appreciate in value." *Id.*

Plaintiffs, however, do not argue that the Wiggins' interests in Galapagos constitute a separate investment contract, but rather that "[t]he Supreme Court has held that 'the plain meaning of the statutory definition mandates [that] stock be treated as 'securities' subject to the coverage of the Acts.'" Doc. 114 at 25 (quoting *Landreth*, 471 U.S. at 687).  The Amended Complaint, however, fails to allege that the membership interests in Galapagos have any of the characteristics associated with common stock, nor do Plaintiffs attempt to explain how the Wiggins' interests in Galapagos meet this definition.  *See Great Lakes Chem. Corp.*, 96 F. Supp. 2d at 387-89 (finding *Landreth* inapplicable to LLC interests

16

because the interests are not "traditional stock" and applying the test for

investment contracts); *see also Nelson v. Stahl*, 173 F. Supp. 2d 153, 163-66

(S.D.N.Y. 2001) (distinguishing between stock in a publicly held company or in a

closely held corporation, which the court found to be a security, and interests in an

LLC, which it found were not); *Busch v. Lee Enters., Inc.*, 2009 WL 5126799, at

*1 (S.D. Ill. Dec. 21, 2009) (noting that "ownership interests in an LLC . . . are not

equivalent to stock").  Because the Amended Complaint fails to allege that the

Wiggins and Beowulf purchased a security, their claims are dismissed.

## B.   *Galapagos Has Standing.*

Defendants[10] also argue that Galapagos does not have standing to maintain

this lawsuit because, according to them, Schuck is the manager of Galapagos, and

Schuck has not brought the action on Galapagos's behalf.[11]   In support of their

argument, Defendants cite to two Member's Certificates, dated September 23 and

26, 2006, signed by Schuck and certifying that she was the sole manager of

Galapagos; Articles of Organization stating that Galapagos is a manager-managed

---

[10]Defendants Vision Bank, Melton, and Braswell did not raise this argument.

[11]The court is not exactly sure how Defendants propose for Schuck to join this lawsuit, though it would make for an interesting twist in a case already involving a number of intertwined relationships.  However, since technically there is nothing that precludes a party from suing herself, presumably there is nothing procedurally that precludes Schuck from being both a party plaintiff and a defendant.

17

LLC and naming Schuck as the initial manager; and a Unanimous Written Consent of All Members and All Managers, signed only by Schuck despite having signature spaces for the Wiggins, which purports to provide Schuck with the unanimous authority to sign loan papers with Vision Bank on behalf of Galapagos. Doc. 97-4.  Defendants further cite to Alabama Code Section 10-12-21, which states, in part, that "[i]f the articles of organization provide that management of the limited liability company is vested in a manager or managers . . . :  (1) No member, acting solely in the capacity as member, is an agent for the limited liability company."  Defendants thus argue that dismissal is warranted because "the Wiggins[] cannot lawfully act as agents for the LLC solely in their capacity as members of the LLC."  Doc. 97 at 17.

To begin, Defendants' argument assumes that a manager for an LLC who has "the power to manage the business or affairs of the limited liability company," (*see* Ala. Code. § 10-12-22), is also granted the sole authority to institute legal proceedings on the LLC's behalf even when, as here, the manager is only a 20% minority member and the majority members wish to bring the lawsuit.  Perhaps tellingly, Defendants fail to cite a single case in support of their position, and this court can find none.

Nevertheless, even if Defendants' interpretation of the Alabama Limited

18

Liability Act is correct, their argument fails for the more fundamental reason that Plaintiffs deny that Schuck was the manager in September 2006 at the time the loan closed and further deny ever granting her the authority to act on Galapagos's behalf without the Wiggins' approval.  Doc. 95 ¶¶ 55-57.  Defendants counter that "[t]he Plaintiffs' unsupported allegations in their Amended Complaint that [] Schuck was not the manager of Galapagos LLC do not change the fact that Galapagos LLC is, by law, organized as a manager managed LLC, and there is no proof before the Court that those Articles of Organization listing [] Schuck as the manager have been modified."  Doc. 97 at 16.  Defendants miss a key point – this issue is before the court on a motion to dismiss and, consequently, the court is required to accept all factual allegations as true.  *Grossman*, 225 F.3d at 1231.  At this stage of the proceedings, Plaintiffs are not required to offer proof in support of their allegations.

Furthermore, on a motion to dismiss, the court cannot consider any materials beyond the facts of the complaint and documents attached thereto.  *Fin. Sec. Assurance*, 500 F.3d at 1284.  The Eleventh Circuit, however, recognizes an exception "in cases in which a plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss."  *Id*. (citations omitted).  Here, the

validity of the Member's Certificates, the Articles of Incorporation, and the

Unanimous Written Consent are in dispute and, further, the court is unable to

determine on the record before it whether they will be central to Plaintiffs' claims.

*See, e.g.*, *McCanna v. Eagle*, 2009 WL 1510159, at *3 (M.D. Fla. May 5, 2009)

(declining to consider organizational and operating agreements for various limited

liability companies attached by the defendant on a motion to dismiss when it was

not clear that such documents would be central to the plaintiff's claims).

Therefore, the court declines to find that Galapagos lacks standing to bring this

action.

**C.      *Plaintiffs Sufficiently Allege the Existence of an Investment Contract.***

Another threshold question is whether the Amended Complaint adequately

alleges that the hotel development constitutes an "investment contract," and

therefore is a security within the meaning of the Securities Act.[12]  15 U.S.C. §§

---

[12]15 U.S.C. § 77b(a)(1) defines a security as follows:

The term "security" means any note, stock, treasury stock, security future, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

77a *et seq*.; *Fin. Sec. Assurance*, 500 F.3d at 1285.  Defendants unpersuasively argue that Plaintiffs have not alleged the existence of a security and, therefore, fail to state a claim.

An investment contract is "a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party."  *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 754 (11th Cir. 2007) (quoting *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946)).  "It embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  *Howey*, 328 U.S. at 299.

The purchase of land or housing units for personal use does not constitute an investment contract.  *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 858 (1975) (concluding that shares of stock in a housing cooperative were not an investment contract as the owners lived at the housing cooperative and had no prospect of deriving a profit from their investment); *Rice v. Branigar Org., Inc.*, 922 F.2d 788, 790-91 (11th Cir. 1991) (houses and lots in a beach club development were not investment contracts when evidence indicated that plaintiffs purchased them for personal consumption).  However, the purchase of property for

investment purposes may constitute an investment contract and, thus, a security.

*See Howey Co.*, 328 U.S. 293 (concluding that offering of units of a citrus grove development with a contract for cultivating, marketing, and remitting the proceeds to the investor constituted a security); *see also Sewell v. D'Alessandro & Woodyard, Inc.*, 655 F. Supp. 2d 1228, 1238-40 (M.D. Fla. 2009) (denying motions to dismiss when the plaintiffs alleged that they purchased homes solely for the purpose of investment).  Therefore, to the extent Defendants rely on the fact that the alleged investment contract is related to property development, (*see, e.g.*, doc. 127 at 4), the court disagrees that such contracts, by their very nature, are not investment contracts.[13]

The Eleventh Circuit employs a four-part test[14] derived from *Howey* to determine whether a transaction is an investment contract: "(1) an investment of

---

[13]In their reply, Defendants Peacock and Baker Donelson also argue that, if the investment contract contains the verbal representations or assurances alleged in the Amended Complaint, it must be subject to Alabama's Statute of Frauds.  Doc. 125 at 3 n.3.  These Defendants ignore the clear Supreme Court authority to the contrary: "Oral contracts for the sale of securities are sufficiently common that the Uniform Commercial Code and statutes of frauds in every State now consider them enforceable. . . .  Any exception for oral sales of securities would significantly limit the Act's coverage, thereby undermining its basic purposes."  *Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 595 (2001) (option to buy stock was a "security" within Rule 10b-5 when option was given by oral agreement).  Therefore, the argument is unpersuasive.

[14]Some cases describe the test as a three-part test, conflating the third and fourth prongs. *See, e.g.*, *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999).  The analysis, however, is identical.

money, (2) a common enterprise, (3) the expectation of profits, and (4) the expectation of profits to be derived solely from the efforts of others." *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 731-32 (11th Cir. 2005) (per curiam) (citing *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1198 (11th Cir. 1999)).  Defendants dispute only the fourth prong – whether Plaintiffs expected to receive profits solely from others' efforts.  Doc. 97 at 9-13; Doc. 101 at 4;  Doc. 104 (incorporating by reference Doc. 37 at 3-4; Doc. 82 at 3-4; Doc. 83 at 3-4; Doc. 84 at 3-4; Doc. 85 at 3-4); Doc. 108 (incorporating by reference Doc. 86 at 3).

The Eleventh Circuit reiterated in *Merchant Capital* that the word "solely" in the *Howey* test "is not interpreted restrictively," noting that "[t]he Supreme Court has repeatedly emphasized that economic reality is to govern over form and that the definitions of the various types of securities should not hinge on exact and literal tests."  483 F.3d at 754-55 (citations and internal quotation marks omitted). "An interest thus does not fall outside the definition of investment contract merely because the purchaser has some nominal involvement with the operation of the business.  Rather, 'the focus is on the dependency of the investor on the entrepreneurial or managerial skills of a promoter or other party.'" *Id*. at 755 (citing *Gordon v. Terry*, 684 F.2d 736, 741 (11th Cir. 1982)).

The Eleventh Circuit then recognized three situations in which a general

partnership or joint venture interest may qualify as an investment contract:

> (1) An agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership,
>
> (2) The partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers,
>
> (3) The partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

*Id*. at 755 (citing *Williamson v. Tucker*, 645 F.2d 404, 418 (5th Cir. May 20, 1981))[15] (internal citations and quotation marks omitted).

Furthermore, the court must examine the "expectations of control at the time the interest is sold, rather than at some later time after the expectations of control have developed or evolved." *Merchant Capital*, 483 F.3d at 756 (citing *Williamson*, 645 F.2d at 424 n.14). However, courts may look to the actual operation of the partnership to determine the initial allocation of control. *Id*. (citing *Albanese v. Fla. Nat'l Bank of Orlando*, 823 F.2d 408, 412 (11th Cir. 1987) (per curiam)). Although courts look first to the control retained under the parties' written agreements, *Unique Financial Concepts*, 196 F.3d at 1201, "[c]onsistent

_____

[15]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precendent all decisions from the former Fifth Circuit decided on or before September 30, 1981.

with *Howey*'s focus on substance over form," courts "look at all the representations made by the promoter in marketing the interests, not just at the legal agreements underlying the sale of the interest." *Merchant Capital*, 483 F.3d at 756 (citing *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 353 (1943)) ("The ultimate issue under *Howey* is whether the partners expected to rely solely on the efforts of others, and we may rely on the totality of the circumstances surrounding the offering in making this determination."); *see also Rodriguez v. Banco Cent.*, 777 F. Supp. 1043, 1059 (D.P.R. 1991) ("We believe . . . that a plaintiff might well prove the existence of a security despite a written land sales contract which does no more than require the transfer of title where the plaintiff can show that the sales pitch made specific promises of development within a given time frame and which specifically recited the common nature of the financing and so forth.").

Plaintiffs sufficiently allege that they entered into the agreement expecting to realize their expected profits solely through the efforts of others.  Accepting their allegations as true, they meet all three of the situations identified in *Merchant Capital* that qualify a joint venture as an investment contract.  With respect to the first situation, Plaintiffs allege that the agreement left them with "little power" over the project.  Specifically, Plaintiffs allege the following: (1) that at the time Defendants approached them to invest in the project, the project developers "had

already completed the plans, design, engineering, permits, licenses, site acquisition/clearance, preliminary construction and obtained the licenses, permits and construction funding commitment from Vision Bank . . . ," (doc. 95 ¶ 26); (2) that Peacock, Baker Donelson, Schuck, and Raley emphasized that the developers would continue to control the construction of the facilities and that Plaintiffs' control would be limited to "the investment decisions and the funds to be used for construction," (*id*. ¶ 33); (3) that they invested in the project on Defendants' condition that the developers would retain control of the entire project, including the hotel's construction, because the developers had the federal license permitting them to construct the marine mammal public display facility and the experience necessary to develop the facility, (*id*. ¶¶ 177-80); (4) that, although Galapagos held a one-third interest in the building site, the developers "retained ownership of the hotel's ground floor, parking, retail/commercial space and the marine mammal aquariums in the hotel's lobby and flanking structures," (*id*. ¶ 190); (5) that the "hotel component of the Marine Park could not be built or operated without the other components of the Park which were essential to the earnings and profit of the investment," (*id*. ¶ 197); (6) that Defendants hired the architects, engineers, surveyors, inspectors, permitting agencies, licensors, accountants, bookkeepers, contractors, subcontractors, and developers prior to

Plaintiffs' investment and that Plaintiffs never had any interactions with those professionals, (*id*. ¶ 200); and (7) that Defendants, and Raley in particular, received all notices and communications from Vision Bank and that, thus, Plaintiffs did not even know that construction had begun until six months after the fact, (*id*. ¶ 190).  Additionally, Plaintiffs further allege that they had no communication with Hugghins and Younce, who owned the two LLCS that purchased the remaining two-thirds investment in the hotel development.  *Id*. ¶¶ 207, 211.  Rather, the investors relied on Defendants and did not have a separate governance mechanism to control the hotel project.  *Id*.  These allegations suggest that, while Plaintiffs may have expected to retain some limited control over the disbursement of their investment funds, Plaintiffs ceded virtually all control over the manner in which the hotel component was designed, constructed, and marketed.

Plaintiffs also allege that they meet the second situation because they had no experience or expertise in developing resort hotels or marine parks and that the Wiggins' real estate experience was limited to construction of their residences and law office.  *Id*. ¶ 206.  Furthermore, Hugghins, who was a farmer, and Younce, who is a woodcarver retired from the phone company, allegedly also lacked any relevant property development experience .  *Id*. ¶¶ 207, 211.  Based on Plaintiffs'

27

allegations, all three investors lacked the necessary experience in the

*particular* business  – a resort and marine park development – in which they

invested.  *See Merchant Capital*, 483 F.3d at 762 (noting that courts should look

to plaintiffs' experience in the specific type of business at issue and not their

general business experience).

Finally, Plaintiffs sufficiently allege that the unique nature of the

development at issue, which required a special federal license and substantial

expertise in developing and managing a marine park with a hotel complex,

prevented them from easily replacing the developers or exercising their own

control over the project.  Doc. 95 ¶¶ 177-80.  *See, e.g., Albanese*, 823 F.2d 408

(concluding that even if investors in ice machines had some limited control over

their investment, it was illusory because they had no realistic alternative to

allowing the defendant to manage their investments); *see also McCanna*, 2009 WL

1510159, at *5 (plaintiff who invested in a private yacht club marina without any

prior practical or management experience with that type of project pled the

existence of an investment contract).

In seeking to establish that Plaintiffs in fact retained control over their

investment, Defendants cite to an Option Agreement signed by Raley and Burnett

on May 18, 2006.  *See* Doc. 101 at 6.  Plaintiffs allege, however, that they and the

other investors never exercised the Option Agreement.  Doc. 95 ¶ 42.  Accepting

this allegation as true, the court concludes that the Option Agreement is not

helpful to a determination of the control Plaintiffs retained over the investment.[16]

Additionally, Defendants point to the Loan Agreement as further evidence of

Plaintiffs' control.  Doc. 97 at 11.  Plaintiffs, however, allege that Schuck signed

the Loan Agreement on behalf of Galapagos without the knowledge or approval of

the Wiggins and only after Robert Wiggins refused to sign it.  Doc. 95 ¶¶ 55-56.

The court finds that the Amended Complaint sufficiently alleges that

Plaintiffs expected to derive their profits solely from the efforts of others.  Thus,

Plaintiffs plead the existence of an investment contract.  Whether Plaintiffs can

prove that Defendants sold them the investment contract described in the

Amended Complaint is not presently before the court; for purposes of these

motions to dismiss, it is sufficient that Plaintiffs made those allegations.

Accordingly, this aspect of the motions is denied.[17]

---

[16]The court recognizes that this allegation conflicts, or is at least in tension with, allegations in Plaintiffs' original Complaint, which attached and referenced the Option Agreement.  Doc. 1 ¶¶ 21, 22, 25; Doc. 1-1.  Nevertheless, having granted Plaintiffs leave to amend, the court looks solely to the allegations of the Amended Complaint.  *See Fritz v. Standard Sec. Life Ins. Co. of N.Y.*, 676 F.2d 1356, 1358 (11th Cir. 1982) (amended complaint supersedes the original complaint).

[17]The court further denies, without prejudice, the arguments raised on the security issue by Defendants Vision Bank, Melton, and Braswell.  The Eleventh Circuit has cautioned that "[t]he law in this circuit is clear: the party opposing a motion for summary judgment should be permitted an adequate opportunity to complete discovery prior to consideration of the motion."

### D.     The Amended Complaint Satisfies the Heightened Pleading under Rule 9 and the PSLRA for a Rule 10b-5 Claim.[18]

Plaintiffs allege that Defendants violated Section 10(b) of the Exchange Act

and Rule 10b-5 promulgated thereunder by employing a manipulative or deceptive

device in connection with the purchase of the investment contract at issue here.[19]

"To allege securities fraud under Rule 10b-5, a plaintiff must show: (1) a

misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on

_____

*Jones v. City of Columbus, Ga.*, 120 F.3d 248, 253 (11th Cir. 1997).  Plaintiffs have properly
filed an affidavit pursuant to Federal Rule of Civil Procedure 56(f), setting forth the reasons why
they cannot present facts essential to justify their opposition without further discovery.  Doc. 54.
The court agrees with Plaintiffs that, having pled a federal cause of action for securities fraud,
they are entitled to an opportunity for discovery.

[18]Except with respect to control person liability, discussed below, Vision Bank, Melton,
and Braswell did not challenge Plaintiffs' Amended Complaint for failure to state a claim.

[19]Section 10(b), 15 U.S.C. § 78j, provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or
instrumentality of interstate commerce or of the mails, or of any facility of any national securities
exchange – (b) To use or employ, in connection with the purchase or sale of any security
registered on a national securities exchange or any security not so registered . . . any manipulative
or deceptive device or contrivance in contravention of such rules and regulations as the
Commission may prescribe as necessary or appropriate in the public interest or for the protection
of investors.

Rule 10b-5, 17 C.F.R. § 240.10b-5, was promulgated under Section 10(b) and provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or
instrumentality of interstate commerce, or of the mails or of any facility of any national securities
exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue
statement of a material fact or to omit to state a material fact necessary in order to make the
statements made, in the light of the circumstances under which they were made, not misleading,
or (c) To engage in any act, practice, or course of business which operates or would operate as a
fraud or deceit upon any person, in connection with the purchase or sale of any security.

which plaintiff relied, (5) that proximately caused his injury." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006) (quoting *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1281 (11th Cir. 1999)).  Additionally, the misrepresentation must be made in connection with the purchase or sale of a security.  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236 (11th Cir. 2008).

Under Federal Rule of Procedure 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  "Rule 9(b) is satisfied if the complaint sets forth '(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Garfield*, 466 F.3d 1255, 1262 (quoting *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)).  "The plaintiff must allege facts with respect to *each* defendant's participation in the fraud."  *See Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010) (citation omitted) (discussing pleading requirements under Rule 9(b) in RICO case).  "The application of Rule 9(b), however, must not abrogate the concept of notice pleading."  *Tello v. Dean Witter*

31

*Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir. 2007) (citation and internal quotation marks omitted).

"Rule 9(b) does not require a plaintiff to allege specific facts related to the defendant's state of mind when the allegedly fraudulent statements were made." *Mizzaro*, 544 F.3d at 1237.  However, in 1995, Congress passed the Private Securities Litigation Reform Act ("PSLRA") as a "check against abusive litigation by private parties." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  The PSLRA implemented heightened pleading requirements requiring that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  Additionally, if an action requires proof that the defendant acted with a particular state of mind, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  Thus, the complaint "must allege facts supporting a strong inference of scienter 'for each defendant with respect to each violation.'"  *Mizzaro*, 544 F.3d at 1238 (quoting *Phillips v. Scientific-Atlanta, Inc.*,

374 F.3d 1015, 1016 (11th Cir. 2004)).

In the Eleventh Circuit, Section 10(b) and Rule 10b-5 "require a showing of either an 'intent to deceive, manipulate, or defraud,' or 'severe recklessness.'" *Id*. (quoting *Bryant*, 187 F.3d at 1282).  "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  *Id*. (quoting *Bryant*, 187 F.3d at 1282 n.18).

In *Tellabs*, the Supreme Court addressed what constitutes a "strong inference" of scienter, holding that "an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  551 U.S. at 314.  In undertaking this inquiry, "courts must consider the complaint in its entirety" to determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id*. at 322-23 (citations omitted) (emphasis in original).

The court notes at the outset that while certain Defendants, specifically Peacock, Baker Donelson, The Mitchell Company, and Bama Bayou, identified

33

Plaintiffs' alleged pleading deficiencies with at least some particularity, other

Defendants, specifically Schuck, Joe Raley Builders, Inc., Raley, Gulf World,

Burnett, and Raley Builders LLC, submitted very short, nearly-identical briefs that

contained minimal discussion as to why, specifically, the 136-page Amended

Complaint failed to meet the Rule 9(b) and PSRLA pleading standards.  As aptly

stated by another district court faced with such perfunctory motions, "the Court

will not take it upon itself to develop and examine arguments that defendants have

presented in only the broadest and most generic outline form." *Abrams v. CIBA*

*Specialty Chems. Corp.*, 2008 WL 4183344, at *10 (S.D. Ala. Sept. 10, 2008)

(addressing whether the plaintiffs adequately met Rule 9(b)'s standards for

pleading a RICO claim).  Against this background, the court now addresses the

specific pleading deficiencies alleged by individual Defendants.

1.   *The Amended Complaint Identifies Misleading Statements by The*
     *Mitchell Company and Bama Bayou.*[20]

The Mitchell Company and Bama Bayou argue that Plaintiffs fail to

distinguish between different Defendants and, specifically, that they allege that

---

[20]Plaintiffs state that The Mitchell Company and Bama Bayou answered the original
complaint without contesting its sufficiency under Rule 12.  Doc. 113 at 6.  However, "when a
plaintiff files an amended complaint which changes the theory or scope of the case, the
Defendant is allowed to plead anew as though it were the original complaint filed by the
Plaintiff." *Brown v. E.F. Hutton & Co.*, 610 F. Supp. 76, 78 (S.D. Fla. 1985).  Therefore, the
court permits their motion to dismiss.

certain Defendants spoke on behalf of other Defendants without specifying that they had the authority to do so.  Doc. 101 at 11.  While the Amended Complaint does in places refer to Defendants in the collective, the Amended Complaint also contains numerous paragraphs alleging what individual Defendants said, who those Defendants represented, and what those Defendants knew at the time they made the misrepresentations.  Doc. 95 ¶¶ 60-167.  Thus, even though Defendants are sometimes referred to collectively, the Amended Complaint provides ample detail to place each Defendant on notice as to what, precisely, Plaintiffs allege that they did.

Furthermore, with respect to specific misrepresentations made by The Mitchell Company and Bama Bayou, Plaintiffs allege that Raley was the manager of Bama Bayou, which was a joint venture with The Mitchell Company.  *Id*. ¶ 45. Plaintiffs allege that Raley misrepresented the extent of Vision Bank's funding commitment, the developer's intent to complete the marine park in tandem with the hotel component, and the protections in place to prevent misuse of the investors' money.  *Id*. ¶¶ 44-47, 142-45.  The Amended Complaint further alleges that Raley assisted in opening a false bank account and withdrew the investors' funds and monies from the construction loan without Plaintiffs' knowledge or approval.  *Id*. ¶¶ 48-51, 145-48.  Whether Raley actually acted on The Mitchell

Company's or Bama Bayou's behalf is not before the court; it is enough that Plaintiffs have alleged that he did and, in so doing, made misrepresentations to Plaintiffs.

> 2.    *Plaintiffs' Allegations Provide Sufficient Particularity with Respect to Dates.*

Peacock and Baker Donelson argue that, although the Amended Complaint identifies some dates with specificity, some acts are alleged to have occurred "at various points throughout the period between October 2006 and November 2008" and that these "broad dates are virtually meaningless." Doc. 97 at 2-3. Plaintiffs concede that some precise dates may be beyond their current knowledge. Doc. 113 at 14-15. However, because Plaintiffs identify the majority of statements and acts with precision, this court determines that they are entitled to obtain additional specific dates through discovery. *See* Doc. 95 ¶¶ 60-110; *see also Holmes v. Baker*, 166 F. Supp. 2d 1362, 1375 (S.D. Fla. 2001) (concluding that complaint contained sufficient detail when it provided approximate dates of many transactions, and remarking that "every complaint could be more detailed").

> 3.    *Plaintiffs Sufficiently Allege What Peacock and Baker Donelson Expected to Obtain as a Consequence of the Fraud.*

Peacock and Baker Donelson further argue that the Amended Complaint fails to state what they stood to obtain as a result of the fraud. Doc. 97 at 3-5. The

Amended Complaint alleges that Peacock, who is a partner in the Baker Donelson law firm, "stood to make substantial personal profits and fees from such a scheme."  Doc. 95 ¶ 132.  By extension, the partnership as a whole stood to gain as well from the profits and fees.  Thus, the Amended Complaint sufficiently alleges what these Defendants stood to gain.

> 4. *Plaintiffs Sufficiently Allege that Defendants Fraudulently Concealed Their Actions from Plaintiffs.*

Peacock and Baker Donelson also argue that the Amended Complaint lacks detail explaining how Defendants fraudulently concealed their actions from Plaintiffs and why Plaintiffs were unable to discover the fraud until December 2008.  Doc. 97 at 7-8.  The court finds that the Amended Complaint provides sufficient detail on the manner and means by which Defendants allegedly concealed the fraud.  The Amended Complaint states, for example, that "all notices and communications about the hotel's development and the construction loan itself were restricted to the promoters" and "Vision [Bank] sent all communications solely to Raley, including those required to be sent to Galapagos LLC, such as past due notices, interest rate changes, payment deadlines and other critical communications."  Doc. 95 ¶ 190.  Additionally, the Amended Complaint alleges that Defendants closed the loan without the Wiggins' permission, Vision

Bank deposited the construction loan funds in an account Raley controlled, and

Vision Bank then permitted Raley to withdraw the funds without the knowledge or

approval of Galapagos or the Wiggins.  *Id*. ¶¶ 51, 53-56.   Accepting these

allegations as true, the court concludes that the Amended Complaint sufficiently

alleges how Defendants managed to conceal their fraudulent activity from

Plaintiffs.

> 5.    *The Amended Complaint Creates a Strong Inference that Defendants
>       Acted with the Required Mental State.*

Defendants The Mitchell Company and Bama Bayou argue that the

Amended Complaint "fails to plead with particularity any substantive facts"

related to scienter for those two Defendants as required by the PSLRA.  Doc. 101

at 12-13.  Peacock and Baker Donelson argue that Plaintiffs fail to demonstrate

how Peacock and Baker Donelson knew that Vision Bank did not intend to fully

fund or complete the project and, moreover, why they would lure Plaintiffs into a

worthless investment.  Doc. 97 at 5-7.  Peacock and Baker Donelson further argue

that a much more plausible inference is that the investment was handled in good

faith.  *Id*. at 6.

Considering the Amended Complaint in its entirety, the court concludes that

it gives rise to a "strong inference" of scienter for each Defendant, an inference

that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314, 322-23.  Accepting the allegations of the Amended Complaint as true, Plaintiffs allege that Defendants enticed them to invest in the hotel project with assurances that (1) they had the funding to complete the resort as well as the surrounding Gulf World Marine Park, (2) they would complete the hotel project within the $5 million construction advance committed by Vision Bank, (3) the developers had the appropriate licenses and expertise to proceed with the project, and (4) they would disburse funds from the construction loan only if the developers reached certain benchmarks in the project.  Doc. 95 ¶¶ 47, 171.  Plaintiffs further allege that each Defendant knew at the time of making these representations that (1) Vision Bank had not guaranteed the funding, (2) the investment was not sufficiently funded to permit simultaneous completion of the hotel and surrounding marine park, (3) the project could not be completed on the timetable represented, and (4) the agreed-upon safeguards (the construction contract, performance and payment bond, and architect's contract or certification of construction progress) were not in place.  *Id*. ¶¶ 121-25, 133-37, 142-45, 151-54, 159-62.

Galapagos and the two other investors purchased the investment contract, which included the land for the hotel.  *Id*. ¶¶ 209, 211.  The investors' funds,

which totaled $1,200,000, were placed into an account at Vision Bank to which,

unbeknownst to Plaintiffs, Raley and Burnett had access.  *Id*. ¶¶ 48-50, 211.  In

September 2006, Galapagos was scheduled to close their mortgage and loan to

fund the construction of the hotel.  *Id*.  However, because the agreed-upon

safeguards were not in place, Robert Wiggins refused to sign the mortgage and

loan on behalf of Galapagos, and the Wiggins also refused to give Schuck the

unilateral authority to close the loan for Galapagos.  *Id*.  Nevertheless, without the

Wiggins' knowledge or approval, Peacock, Baker Donelson, and Vision Bank

drew up, and Schuck signed, a Member's Certificate stating that she had the

unilateral authority to sign papers on Galapagos's behalf.  *Id*. ¶ 56.  The loan

closed without the Wiggins' knowledge or approval.  *Id*. ¶¶ 56-57.  Vision Bank

then deposited the funds into an account that Raley, one of the property

developers, controlled.  *Id.* ¶¶ 58, 118.  Shortly thereafter, still without the

Wiggins' knowledge, the developers began construction and started withdrawing

the loan funds from the account Raley.  *Id.* ¶¶ 58, 119.  Raley was able to

authorize checks to himself and other Defendants without Plaintiffs' approval and

without providing assurances that the hotel and marine park construction remained

on schedule.  *Id*. ¶¶ 118-19.  Alleging that Defendants knew that they had not

authorized the draws, Plaintiffs cite an internal email from one Vision Bank

officer to two others (including Melton) stating, "Alright – if you two jacklegs want to do a draw for Galapagos LLC without Robert Wiggins' approval . . . then fine," and a later Vision Bank email attaching another draw and asking "[w]ho at Vision Bank wants to sign off on this advance." *Id*. ¶ 131.  Ultimately, the developers exhausted the loan when the hotel's construction was, at most, 50% complete and without completing the marine park – the main attraction for hotel guests.  *Id*. ¶ 54.  These allegations create a strong inference that Defendants acted, at a minimum, with severe recklessness.

The competing inference to draw from the Amended Complaint is that Defendants entered into a joint venture with Plaintiffs in good faith and then, due to the poor economy or other reasons, the venture collapsed before they completed construction.  However, accepting Plaintiffs' allegations as true, the inference that Plaintiffs ask the court to draw is more compelling than that competing inference. In particular, it is difficult to see how Defendants, in good faith, guaranteed funding that they did not have, closed a loan on Galapagos's behalf without the authority to do so, and disbursed the construction funds to themselves without Plaintiffs' knowledge or approval.

**E.**      ***Plaintiffs Fail to Sufficiently Allege a Claim for Control Person Liability.***

Plaintiffs allege control person liability under Section 20(a) of the Exchange

Act against all Defendants, predicated upon the same allegations discussed above.

*Id*. ¶¶ 213-16.  Section 20(a) provides:

> Every person who, directly or indirectly controls any person liable
> under any provision of this chapter or of any rule or regulation
> thereunder shall also be liable jointly and severally with and to the
> same extent as such controlled person to any person to whom such
> controlled person is liable, unless the controlling person acted in good
> faith and did not directly or indirectly induce the act or acts
> constituting the violation or cause of action.

15 U.S.C. § 78t(a).  To state a claim under Section 20(a), Plaintiffs must allege (1)

a primary violation of the securities law, (2) Defendants' "power to control the

general business affairs" of the controlled person, and (3) Defendants' "power to

directly or indirectly control or influence the specific corporate policy which

resulted in primary liability."  *Mizzaro*, 544 F.3d at 1237 (citations and internal

quotation marks omitted); *see also Laperriere v. Vesta Ins. Group, Inc.*, 526 F.3d

715, 723 (11th Cir. 2008) (per curiam).  "However, a complaint that merely

restates the legal standard for control person liability, without providing facts in

support of the allegation, does not adequately plead control person liability."

*Tippens v. Round Island Plantation, L.L.C.*, 2009 WL 2365347, at *10 (S.D. Fla.

July 31, 2009) (dismissing claim with prejudice when plaintiff provided no factual

support for its conclusory allegations of control and, specifically, failed to state

who the defendants allegedly controlled and what status gave them the ability to

exert that control).

Here, the Amended Complaint merely alleges that Defendants "were involved in interlocking relationships with one another" and that they all played roles in the development project.  Doc. 95 ¶ 34.  Plaintiffs fail to explain who or what entity is the controlled person, and how each Defendant had the power to control the business affairs of the controlled person.  The court finds that Plaintiffs fail to plead a violation of Section 20(a) and therefore dismisses this claim with prejudice.[21]

### F.   *Further Discovery Is Required to Determine the Role of Vision Bank, Melton, and Braswell.*

Defendants Vision Bank, Melton, and Braswell argue that, even if the development deal is a security, they are not liable because they did not sell the

---

[21]"A district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court."  *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) (en banc) (noting that "[t]his new rule is more efficient and in line with the critically important concept of finality in our judicial system"); *see also Novoneuron Inc. v. Addiction Research Inst., Inc.*, 326 Fed. Appx. 505, 507 (11th Cir. 2009) (per curiam) (court not required to *sua sponte* grant leave to amend when plaintiff responded to motions to dismiss and did not request further leave to amend).  In this case, Plaintiffs initially moved for leave to amend after most Defendants filed motions to dismiss.  Doc. 90.  The court granted Plaintiffs' motion on November 19, 2009, and mooted the motions pending at that time.  Doc. 94; Text Order dated Dec. 1, 2009.  Thereafter, Plaintiffs filed this Amended Complaint, which still fails to cure the deficiencies in their control person liability claim.  Plaintiffs have not requested an additional opportunity to amend their complaint.  Based on the Eleventh Circuit's clear authority in *Wagner*, this court determines that Plaintiffs are not entitled to another opportunity to replead their Section 20(a) claim.

security and "the standards for imposition of liability on second actors are not met." Doc. 103 at 23. As discussed above, the court concludes that Plaintiffs have properly moved for discovery under Federal Rule of Civil Procedure 56(f) and that Plaintiffs are entitled to that discovery. The court therefore denies, without prejudice, this portion of the motion for summary judgment.

## G.    *Gulf World and Raley Builders LLC Are Not Due to Be Dismissed.*

Gulf World and Raley Builders LLC each raised new arguments in their reply briefs in favor of their dismissal. Raley Builders LLC argued that dismissal is warranted because it is a separate entity from Joe Raley Builders, Inc., which it claims is the proper party for this action. Doc. 129 at 2. As evidence, Raley Builders LLC attached articles of incorporation for itself and Joe Raley Builders, Inc. Doc. 129-1; Doc. 129-2. Gulf World argues that it is a non-managing member of Bama Bayou and, as such, it took no part in the transactions alleged in the Amended Complaint and cannot be held liable for any actions taken by Bama Bayou. Doc. 128 at 2-3. Gulf World further offers to submit its books and records to the court for an *in camera* review. Doc. 128 at 3.

Neither of these arguments is appropriately addressed on a motion to dismiss. First, on a motion to dismiss, the court is limited to a review of the Amended Complaint and any documents incorporated therein, and neither the

articles of incorporation for Joe Raley Builders, Inc. or Raley Builders LLC nor

the books and records of Gulf World are incorporated within the Amended

Complaint.  Second, the arguments raised by these Defendants would require the

court to adjudicate the scope of their liabilities rather than simply test the

sufficiency of Plaintiffs' allegations.  *See Young Apartments, Inc. v. Town of*

*Jupiter, Fla.*, 529 F.3d 1027, 1037 (11th Cir. 2008) ("A motion to dismiss does not

test the merits of a case, but only requires that the plaintiff's factual allegations,

when assumed to be true, must be enough to raise a right to relief above the

speculative level." (citation and internal quotation marks omitted)).  Finally, even

if the court could address these issues on a motion to dismiss, it would decline to

do so because these Defendants raised the arguments in their replies and "district

courts . . . ordinarily do not consider arguments raised for the first time on reply."

*Park City Water Auth., Inc. v. N. Fork Apartments, L.P.*, 2009 WL 4898354, at *1

n.2 (S.D. Ala. Dec. 14, 2009) (collecting cases).  Gulf World and Raley Builders

LLC may renew their arguments in a motion for summary judgment.

**H.**    ***The Alabama Legal Services Liability Act Does Not Require Dismissal of the Claims against Peacock and Baker Donelson.***

Defendants Peacock and Baker Donelson argue that this court should

dismiss Plaintiffs' claims because they "derive from the delivery of legal services"

and thus the action "no matter how styled, is one for legal malpractice." Doc. 97

at 13. They contend that Plaintiffs are limited to bringing their claims under the

Alabama Legal Services Liability Act, Ala. Code § 6-5-573 ("ALSLA"), which

they have done in state court. Doc. 97 at 14. This argument is unpersuasive.

Plaintiffs have alleged more than just the delivery of legal services and contend

that these two Defendants were actual participants in a scheme to defraud them.

Moreover, Plaintiffs have pled a cause of action under a law which recognizes that

*lawyers* may be liable. *See Cent. Bank of Denver*, *N.A. v. First Interstate Bank of*

*Denver, N.A.*, 511 U.S. 164, 191 (1994) ("Any person or entity, including a

lawyer, accountant, or bank, who employs a manipulative device or makes a

material misstatement (or omission) on which a purchaser or seller of securities

relies may be liable as a primary violator under 10b-5 . . . ."). In short, this is a

federal cause of action in a federal court; the ALSLA simply has no bearing on

this dispute.

## I.   *The Court Denies Peacock and Baker Donelson's Motion to Strike*.

Peacock and Baker Donelson ask the court to strike various portions of the

Amended Complaint on the basis that those paragraphs do not meet the pleading

standards applicable to this case. Doc. 97 at 1-3, 7, 8, 12, 17. The court addressed

these Defendants' challenges to the sufficiency of the pleadings in Section III.D.,

*supra*.  For the same reasons stated therein, the motion to strike is denied.

## V.   CONCLUSION

For the reasons set forth above, the motions to dismiss and the motion for summary judgment are granted in part and denied in part.  Robert Wiggins, Ann Wiggins, and Beowulf are dismissed as plaintiffs for lack of standing.  Claims under Section 20(a) against all Defendants are dismissed for failure to state a claim.  In all other respects, the motions are denied.

DONE this 20th day of July, 2010.


**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE